## In re RENT–WAY SECURITIES LITIGATION.

### Civil Action No. 00–323 Erie.

United States District Court, W.D. Pennsylvania.

Dec. 22, 2003.

Bruce W. Bernard, Bernard, Stuczynski & Bonanti, Erie, PA, Solomon B. Cera, Gold, Bennett, Cera & Sidener, LLP, San Francisco, CA, for Lead Plaintiffs.

Kevin M. Kearney, Hodgson Russ, Buffalo, NY, Paul M. Pohl, Bryan D. Kocher, Jones, Day, Reavis & Pogue, Frederick W. Thieman, Thieman & Kaufman, Pittsburgh, PA, Timothy M. Sennett, Knox, McLaughlin, Gornall & Sennett, Erie, PA, John L. Oberdorfer, Lanny Davis, Patton Boggs, Washington, DC, Robert N. Rapp, Calfee, Halter & Griswold, Cleveland, OH, T. Warren Jones, MacDonald, Illig, Jones & Britton, Erie, PA, Robert J. Kopecky, Kirkland & Ellis, Chicago, IL, for Defendants.

## *MEMORANDUM OPINION*

MCLAUGHLIN, District Judge.

In this class action lawsuit, Plaintiffs aver that accounting improprieties at Rent–Way, Inc. artificially inflated the price of Rent–Way's common stock during the period December 10, 1998 through October 27, 2000 (the "Class Period"). When the discrepancies were disclosed, the price of the stock fell precipitously, resulting in

a number of securities fraud lawsuits that have been consolidated in this litigation.

Presently pending before the Court is a motion for final approval of a stipulated settlement (the "Settlement") between Lead Plaintiff for the Class, Cramer Rosenthal McGlynn, LLC ("Lead Plaintiff" or "Cramer Rosenthal"), and Defendants Rent–Way, Inc. ("Rent–Way" or the "Company"), William E. Morgenstern, William A. McDonnell, and Jeffrey A. Conway (collectively, the "Settling Defendants") and approval of Cramer Rosenthal's proposed plan of allocation (the "Allocation Plan") relative to the settlement proceeds. Also pending are applications for attorneys' fees filed by legal counsel for Cramer Rosenthal ("Class Counsel" or "Lead Counsel"), legal counsel for objector Harry J. Keller, Jr. and legal counsel for objector Frank Waters. For the reasons set forth below, the Court will approve the proposed Settlement and the Allocation Plan, grant Class Counsels' request for attorneys' fees, and deny the fee petitions filed by Objectors Harry J. Keller, Jr. and Frank Waters.

## I. BACKGROUND

### A. Facts

Rent–Way is a company in the business of renting home entertainment equipment, furniture, appliances, and other merchandise to its customers under full-service rental-purchase agreements. The Company was founded in 1981 to operate one rent-to-own store in Erie, Pennsylvania. By the time of its initial public offering in 1993, Rent–Way had expanded to 19 stores in three states. Thereafter, it implemented an aggressive acquisition campaign. By December 1998, it had doubled in size and had become the second largest rent-to-own company in the country. By 2000, Rent–Way owned and operated more than 1100 stores nationwide. The Class Complaint alleges that, because of the tremendous importance placed on Rent–Way's expansion, the Settling Defendants focused on increasing the price of Rent–Way's stock as a means of funding its acquisitions using inflated shares as currency.

The Complaint asserts that, during its period of rapid growth, Rent–Way failed to maintain adequate systems of internal accounting and financial controls. This failure in Rent–Way's accounting systems led to the Company's inability to report its financial results in compliance with Generally Accepted Accounting Principles ("GAAP"). It is alleged that Rent–Way's senior management knowingly took advantage of these inadequacies and engaged in improper accounting practices that materially overstated Rent–Way's reported income and assets and materially understated its expenses.

Because of these misstatements and/or omissions, Rent–Way was forced to restate its financial statements for fiscal years 1998 and 1999, each quarter of fiscal 1999, and the first three quarters of fiscal 2000. In June of 2001, Rent–Way announced that it would eliminate from its financial statements $127 million in previously reported earnings. As a result of these revelations, the price of Rent–Way's stock fell dramatically. In the course of one day, the price dropped eighty percent (80%) from $23–7/16 per share to approximately $5.00 per share.

### B. Procedural History

In the wake of these events, numerous securities fraud lawsuits were commenced against Rent–Way and its officers. Generally, these complaints alleged that shareholders purchased Rent–Way's stock at artificially inflated prices during the Class Period as a result of Defendants' dissemination of false and misleading financial

information. By order dated January 11, 2001 these class actions were consolidated.

Thereafter, in compliance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(a)(3), several shareholders sought appointment as the statutory Lead Plaintiff. On March 9, 2001, this Court issued an Order appointing Cramer Rosenthal as Lead Plaintiff and the law firm of Gold Bennett Cera & Sidener LLP ("GBCS") as Lead Counsel. *See EZRA Charitable Trust v. Rent–Way,* 136 F.Supp.2d 435, 445–46 (W.D.Pa. 2001). It was agreed that an amended complaint should not be filed until after Rent–Way filed its Form 10–K for the fiscal year 2000, which would contain Rent–Way's restated financial results for the time covered by the Class Period. Rent–Way filed its Form 10–K with the SEC on July 2, 2001; however, it also announced its intention to file at some future point an amended Form 10–K which would provide Rent–Way's restated figures relative to its quarterly unaudited financial information for the years ending September 30, 1999 and September 30, 2000. The latter form was filed by Rent–Way on August 27, 2001.

On October 5, 2001, Lead Plaintiff filed an amended consolidated class action complaint (the "Complaint"). The Complaint was seventy-five pages and 161 paragraphs in length and named as Defendants Rent–Way, Morgenstern, Conway, McDonnell, Marini, and PricewaterhouseCoopers LLP ("PwC"). It included a multitude of factual averments relative to claims asserted under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), t(a) and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.

In December 2001 each of the named Defendants filed individual motions to dismiss the Complaint. Following an extensive motions practice, the Court issued an Order dated July 11, 2002 which denied the motions of Defendants McDonnell and PwC in part and denied the motions of the remaining Defendants in their entirety. *See In re Rent–Way Secur. Litig.,* 209 F.Supp.2d 493 (W.D.Pa.2002). Defendants filed their Answers to the Amended Complaint on August 9, 2002.

In its September 26, 2002 Case Management Order, the Court directed that merits discovery would commence following the Court's ruling on Class Certification. Nevertheless, the parties were required to make their Initial Disclosures pursuant to Rule 26(a) and Lead Plaintiff was permitted to proceed with document discovery from non-parties. These steps yielded some 250,000 documents which Lead Plaintiff undertook to organize and review.

In May of 2002 Lead Plaintiff began to enter into settlement discussions with the Defendants Rent–Way, Morgenstern, and McDonnell. These discussions ensued for nearly a year, and in March 2003 an agreement in principle was reached.

On June 5, 2003 this Court preliminarily approved the proposed Settlement and provisionally certified a settlement class for purposes of these proceedings. We directed Lead Plaintiff to provide notice of the proposed Settlement to class members through individualized mailings as well as publication in *The Wall Street Journal.* Lead Plaintiff did so and, in accordance with this Court's directive, August 4, 2003 was the last day for class members to opt-out of the Class or object to Lead Plaintiff's proposed Settlement, Allocation Plan, and attorneys' fees petition. As discussed more fully below, only two shareholders have chosen to opt-out of the proposed Settlement. In addition, the Court has received one objection to the proposed Settlement and one objection to Lead Plaintiff's request for attorneys' fees.

## C. The Proposed Settlement

Under the terms of the proposed Settlement, $25,000,000 is to be paid to the Class in exchange for the release of all claims by the class members against the Settling Defendants.[1] Of the $25,000,000 amount, $21,000,000 has already been transferred to an interest bearing escrow account. The remaining $4,000,000 is to be paid pursuant to a two-year, 6 percent (6%) promissory note, payable in $1,000,000 installments every six (6) months, commencing December 31, 2003.

## II. DISCUSSION

### A. The Stipulation for Settlement of Class Action

▇ Rule 23(e) instructs that a class action may not be dismissed or compromised without the approval of the Court and notification to all class members. Fed.R.Civ.P. 23(e). This requires the district court to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." *In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir.2001), *cert. denied sub nom. Mark v. California Public Employees' Retirement Sys.*, 535 U.S. 929, 122 S.Ct. 1300, 152 L.Ed.2d 212 (2002) (citation omitted). In so doing, the district court acts as a "fiduciary guarding the rights of absent class members" by ensuring that the proposed settlement is fair, reasonable, and adequate. *Id.*

▇ Our analysis involves consideration of several factors outlined by the Third Circuit Court of Appeals in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir.1975), *to wit:*

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

*Id.* at 157. The proponents of the settlement bear the burden of proving that these factors weigh in favor of approving the settlement. *Erie County Retirees Ass'n v. The County of Erie*, 192 F.Supp.2d 369, 373 (W.D.Pa.2002) (citing *In re Cendant Corp. Litig.*, 264 F.3d at 232). We consider these factors below in the context of the present record.

### 1. The Complexity, Expense and Likely Duration of the Litigation

The first *Girsh* factor requires us to consider "the probable cost, in both time and money, of continued litigation" so as to determine the degree to which the Class would benefit from settling the class claims amicably. *Erie County Retirees Ass'n*, 192 F.Supp.2d at 373 (citing *In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir.1995)). In considering this factor, some understanding of the Class's theory is necessary.

1. The Class will continue to litigate claims against Defendants PricewaterhouseCoopers LLP ("PwC") and Matthew J. Marini.

# 500

Plaintiffs have alleged that the accounting methods utilized by Rent–Way during the Class Period were deficient in significant respects. It is alleged, for example, that the "Point Of Sale" ("POS") system initially utilized by Rent–Way accounted for rental merchandise depreciation—the second greatest expense on the Company's ledger—differently among the Company's stores. In addition, Plaintiffs claim that the PeopleSoft system, which Rent–Way began to install in August 1999, failed to interface with the POS system, thus requiring the manual transfer of data from the POS system to the PeopleSoft system. Plaintiffs contend this incompatibility created a situation which allowed for the manipulation of key accounting data by Rent–Way employees.

At the same time, Plaintiffs contend that there was tremendous internal pressure placed on Rent–Way's officers and employees to raise and maintain the price of the Company's stock in order to fund its aggressive acquisitions program. Plaintiffs claim that Rent–Way's financial and accounting personnel took advantage of the Company's faulty accounting system by engaging in numerous improprieties designed to artificially inflate the price of the Company's stock by overstating earnings and failing to timely and appropriately recognize items of expenditure. Among other things, it is alleged that Rent–Way's personnel: (i) overstated prepaid advertising by manually altering the dates on advertising invoices; (ii) made improper manual journal entries so as to overstate rental merchandise and understate various expenses (such as rental merchandise depreciation expense, rental merchandise losses, advertising expense and miscellaneous operating expenses); (iii) improperly deferred the reporting of losses resulting from missing rental merchandise at year end; (iv) inappropriately reversed depreciation on rental merchandise relative to the RentaVision acquired stores; (v) materially overstated inventories by disregarding a September 30, 1999 spare parts inventory review; (vi) overstated amounts owing to Rent–Way in connection with vendor rebates; (vii) materially understated expenses such as accounts payable, rental merchandise, property and equipment, occupancy costs, advertising and other expenses; (viii) made improper write-offs relative to terminated leases. These improprieties, it is claimed, ultimately resulted in an overstatement of Rent–Way's earnings to the tune of approximately $127 million.

■ As is readily apparent, the Plaintiffs' theory in this case involves complex accounting issues concerning which expert interpretation and testimony would be required. In fact, Class Counsel represents that its investigation and case preparation thus far have involved consultation with experts in the areas of accounting, auditing, damages and investment banking. Plaintiffs' intended proof is made even more complicated by the fact that these alleged improprieties occurred in numerous different ways, throughout several different corporate accounts—often in small amounts—over the course of nearly three years. Thus, piecing together the Plaintiffs' chain of proof would be a lengthy and complicated undertaking. In that vein, it is telling that Rent–Way claims to have spent some ten months and incurred more than $9,000,000 in professional fees to determine the final amount by which its books needed to be restated.

Plaintiffs' "fraud on the market" theory involves additional complexities in terms of calculating the damages allegedly involved in this case. Class Counsel has represented that Plaintiffs intend to prove their damages through the use of aggregate market data relative to price inflation dur-

ing the Class Period. Plaintiffs intend to call expert witnesses who can extrapolate more specific loss calculations based on this trading data. In short, Plaintiffs' proof of damages will also involve complex issues for the trier of fact.

The expense which this litigation presents to all parties is another factor bearing on approval of the proposed Settlement. As Class Counsel has observed, this has been, and will continue to be, a very expensive case to prosecute and defend in light of the complexity of the issues and the necessity for expert witnesses. As noted, Rent–Way spent more than $9,000,000 to conduct its own internal investigation into the accounting improprieties. The record also shows that at least $3,000,000 in Rent–Way's liability insurance has been expended in defense of this litigation up to the time the proposed Settlement was reached. Class Counsel have invested considerable sums of their own to prosecute this case. Hundreds of thousands of documents have been reviewed and numerous witnesses interviewed by Lead Counsel.

Furthermore, despite the fact that this case has been vigorously litigated for three years already, resolution short of settlement is nowhere near imminent. Class Counsel estimate that many thousands of hours of experienced attorney work remain before this case could be tried against the Settling Defendants. Further prosecution of this case would involve a lengthy process of formal merits discovery. It is likely, if not inevitable, that one or more of the Defendants would submit dispositive pretrial motions, thus necessitating another round of time-consuming and expensive motions practice. Trial itself would be a complicated and lengthy affair. And, regardless which party or parties prevail at trial, a direct appeal would be virtually certain to follow, resulting in further expense and protraction of the proceedings. As Class Counsel notes, even assuming for the sake of argument that the Class could recover a larger judgment at trial, the additional delay that would inevitably follow with post-trial motions and appeals could effectively deny the Class any recovery for several more years. Thus, a future recovery, even one in excess of the proposed Settlement, may ultimately prove less valuable to the Class than receiving the benefits of the proposed Settlement at this time.

Based upon the foregoing considerations, we find that the probable costs of continued litigation in this case would be considerable. The likely expense, complexity and duration of continued litigation are factors that support an approval of the proposed Settlement.

## 2. The Reaction of the Class to the Settlement

The second *Girsh* factor "attempts to gauge whether members of the class support the settlement". *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 317 (3d Cir.1998). In assessing the Class's reaction, we consider the "number and vociferousness" of any objectors. *Id.* (citation omitted).

The record here shows that Lead Plaintiff mailed notice of the proposed Settlement to more than 8,600 individual and institutional class members. Additionally, notice was published in the national edition of *The Wall Street Journal.* Following this notice, only two class members have opted out of the proposed Settlement. In addition, there has been only one objector to the proposed Settlement, that being Harry S. Keller, Jr.—an owner of 200

shares of Rent–Way stock.[2] While it is true that courts are often "cautio[us] in inferring support from a small number of objectors to a sophisticated settlement," *Erie County Retirees Ass'n,* 192 F.Supp.2d at 374 (citing *In re Safety Components, Inc. Secur. Litig.,* 166 F.Supp.2d 72, 85 (D.N.J.2001)), we nevertheless observe that the sole objector to the proposed Settlement comprises an infinitesimal percentage of the total number of class members and of the shares traded during the Class Period. At least at face value, the paucity of objectors suggests overwhelming class-wide support for the proposed Settlement.

In addition, the fact that a large number of class members have already submitted claim forms demonstrates "considerable satisfaction with the results of the litigation." *Fisher Bros., Inc. v. Mueller Brass Co.,* 630 F.Supp. 493, 498 (E.D.Pa.1985). And, notably, there has been no visible opposition from any sophisticated institutional investors such as Safeco Corporation, Kern Capital Management LLC and Montgomery Asset Management, LLC. Taken collectively, this evidence demonstrates a favorable reaction of the Class to the proposed Settlement. Accordingly, this factor weighs somewhat in favor of our acceptance of the Settlement.

### 3. *The Stage of the Proceedings*

■ The third *Girsh* factor requires us to consider the degree to which the litigation has developed prior to settlement. The goal here is to determine "whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Cendant,* 264 F.3d at 235.

■ In this case, the proposed Settlement is the result of intense and protracted negotiations among experienced legal counsel. Negotiations occurred over a period of nearly one year, but the final settlement proposal was reached only after Class Counsel had conducted an extensive investigation of the underlying facts and had been through significant litigation.

The declaration of Solomon B. Cera, Esq. (primary Lead Counsel) shows that, prior to filing the consolidated class action complaint, Class Counsel: undertook the collection and review of substantial documentation which included Rent–Way's SEC filings, press releases and Wall Street analyst reports; interviewed numerous individuals formerly employed by Rent–Way; and consulted with a forensic accounting professional. (*See* Dec. of Solomon B. Cera in Supp. of Final Approval of Settlement, Plan of Allocation of Settlement Proceeds, and Award of Attorneys' Fees and Reimbursement of Expenses, hereafter "Cera Decl.," [Doc. No. 146] at pp. 9–10.) On October 5, 2001, Cramer Rosenthal filed the seventy-five page Amended Consolidated Class Action Complaint (the "Complaint"), which contained highly detailed allegations based on Lead Counsel's previous investigation as well as subsequent public disclosures relative to Rent–Way's accounting improprieties and ongoing factual investigation. (*See* Lead Pl.'s Mem. in Supp of Final Approval of Settlement with Rent–Way Settling Def.s and Plan of Allocation [Doc. No. 149] at p. 3.)

Thereafter, Lead Plaintiff engaged in significant motions practice in defense of its allegations, as each and every named Defendant filed a motion under Rule 12(b) to dismiss the Complaint, raising numerous collective arguments. Certain of the class claims were dismissed but, in principal part, the motions were denied. *See generally In re Rent–Way Secur. Litig., supra.* In brief, the adequacy of Lead

---

**2.** For reasons discussed more fully below, we find Mr. Keller's objections unpersuasive.

Plaintiffs' allegations were vigorously tested.

Following resolution of Defendants' motions to dismiss the Complaint, Class Counsel obtained additional Initial Disclosure materials from Rent–Way and the other Defendants, which included tens of thousands of documents. Class Counsel has represented that Rent–Way alone produced approximately 180,000 e-mail messages and almost 32,000 photocopied documents. (Cera Decl. at p. 14.) PwC, which is not among the Settling Defendants, produced nearly 30,000 documents in its Initial Disclosures, including work product relative to its quarterly reviews and annual audits of Rent–Way's relevant financial statements. (*Id.*) Lead Plaintiff also sought documents from a variety of third party entities, such as Ernst & Young, LLP; Wall Street Investor Relations Corporation; Dain Rauscher Wessels; Banc of America Securities LLC; National City Bank of Pennsylvania; and others. This third-party discovery also yielded some 11,000 documents. According to Class Counsel this plethora of information was reviewed, organized and/or analyzed prior to reaching the proposed Settlement. (*Id.* at pp. 13–14.)

Additional significant time and effort were invested by the parties in arriving at a Stipulated Protective Order Regarding Confidential Information (entered by the Court on March 20, 2003), in resolving disputes relative to class certification discovery, and in determining who should serve as Cramer Rosenthal's "person most knowledgeable" under Fed.R.Civ.P. 30(b)(6). While Lead Plaintiff wanted to submit Scott Scher as its Rule 30(b)(6) witness, ultimately it named its CEO, Ronald McGlynn. In the end, however, lengthy depositions of both individuals were conducted by the Defendants.

Throughout the course of this litigation, Lead Plaintiff's counsel consulted with experts in the fields of damages, investment banking, auditing, and accounting. These consultations helped inform Class Counsels' judgment relative to many issues in the case, such as Rent–Way's alleged GAAP violations and the extent of injury suffered by the Class.

Negotiations with the Settling Defendants continued over a ten-month period, from May 2002 to March 2003 when the terms of the proposed Settlement were finalized. Throughout the negotiations process, numerous legal and practical issues were considered such as the potential strength of the Class's claims and Rent–Way's dire financial condition and limited resources. At all times, however, the negotiations were conducted at arm's length between experienced counsel.

Class Counsel has presented unrebutted testimony that "considerable amounts of time" have been spent "reviewing and analyzing hundreds of thousands of pages of Initial Disclosure documents produced by [D]efendants, dissecting Rent–Way's financials, pursuing every possible avenue to interview anyone with knowledge about the underlying facts of the Litigation, analyzing SEC filings and responding to motions to dismiss." (Cera Decl. [Doc. No. 146] at ¶ 54.)

The Court is cognizant of the fact that merits discovery in this case has not formally commenced beyond the parties' initial Rule 26 disclosures. Nevertheless, as the foregoing demonstrates, Class Counsel has invested substantial time and effort during the three-year pendency of this case investigating and comprehending the relevant facts. We find that the efforts of Class Counsel to date have endowed them with a sufficient appreciation of the merits of the litigation such that Class Counsel could intelligently evaluate the adequacy of

the Settlement. This factor therefore favors approval of the proposed Settlement.

### 4. *The Risks of Establishing Liability*

■ The next *Girsh* factor requires us to consider "what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." *In re Cendant Corp. Litig.*, 264 F.3d at 237. We must attempt to balance the likelihood of success at trial against the benefits of immediate settlement. *In re Prudential Ins.*, 148 F.3d at 319; *In re Safety Components*, 166 F.Supp.2d at 89.

At this point it is relevant to note that, on July 22, 2003, three of Rent–Way's former employees entered pleas of guilty to violations of the federal securities laws. Defendant Jeffrey A. Conway, Rent–Way's former President and Chief Financial Officer and one of the Settling Defendants herein, pleaded guilty to one count of conspiring to falsify Rent–Way's books and records and to circumvent Rent–Way's internal accounting controls in violation of 18 U.S.C. § 371. *See United States v. Conway*, Criminal No. 03–31 Erie (W.D.Pa.) (McLaughlin, J.). Matthew J. Marini (Rent–Way's former Chief Accounting Officer and Controller), who remains a Defendant in this case, pleaded guilty to one count of criminal securities fraud in violation of 15 U.S.C. § 78j(b) and 78ff and 18 U.S.C. § 2. *See United States v. Marini*, Criminal No. 03–32 Erie (W.D.Pa.) (McLaughlin, J.). Jeffrey K. Underwood (Rent–Way's former Senior Vice–President of Operations), who is not a named Defendant in this matter, pleaded guilty to one count of falsifying Rent–Way's books and records from in and around June 2000 to in and around October 2000, in violation of 15 U.S.C. §§ 78m(b)(2)(A), 78m(B)(5) and 78ff. *See United States v. Underwood*, Criminal No. 03–33 Erie (W.D.Pa.) (McLaughlin, J.). Pursuant to his plea agreement with the government, Underwood specifically acknowledged his responsibility for similar conduct occurring in and around September 1999. *See id.*

On the same day that these individuals pleaded guilty, the Securities Exchange Commission filed a civil complaint against Rent–Way, Conway, Marini, and Underwood, alleging various violations of the civil federal securities laws. *See Securities Exchange Commission v. Rent–Way, Inc. et al.*, Civil Action No. 03–231 Erie (W.D.Pa.) (McLaughlin, J.). On July 23, 2003, this Court entered consent judgments as against all four defendants which, in major part, granted prospective injunctive relief permanently enjoining the defendants from engaging in any future securities laws violations. While the consent judgments subjected the individual defendants to fines and/or civil forfeiture penalties, each judgment specifically provided that the consenting defendant was neither admitting nor denying the SEC's substantive allegations relative to the alleged retrospective violations of the federal securities laws. [*See id.* at Doc. Nos. 8–11.].

■ In light of these proceedings, the question becomes what their likely effect would have been at trial in terms of improving the Plaintiffs' ability to establish liability against the Settling Defendants. First, we note that Marini was the only Defendant to have pleaded guilty to a securities fraud violation. Thus, it would appear that Marini would be precluded at trial from challenging the material elements of the civil securities fraud claim against him, as those would have been conclusively established by virtue of his prior guilty plea. We also note that the guilty pleas entered by Conway and Underwood, while not pleas to securities fraud, would likely have been probative on

one or more issues relevant to the Plaintiffs' claims against them.

None of the Settling Defendants' conduct, however, even if established at trial, would necessarily be imputable to Rent–Way as a matter of law. In fact, the record suggests it was Rent–Way's intention to contest legal responsibility for any malfeasance on the ground that any such conduct was perpetrated for the individual's own benefit rather than to further the Company's interests.

In light of the present procedural posture of this case, and disclaiming ownership of any "crystal ball," it is the Court's view that a civil trial would more likely than not have resulted in a liability verdict against at least *some* of the individual Defendants whose conduct may well have been imputable to Rent–Way. In the unique context of this case, however, this conclusion concerning likely liability does not cut strongly against approval of a settlement at this time, as will be discussed more fully below. In all likelihood, even the establishment of liability at trial with respect to the "deep pocket" Defendant, Rent–Way, may well have proven to be a Pyrrhic victory inasmuch as it would have in all likelihood driven the Company into bankruptcy and, with it, the chance for any meaningful recovery by members of the Class.

### 5. The Risks of Establishing Damages

 We next consider the risks that the Class would face in establishing damages, should this case proceed to trial. This factor is similar to the fourth factor in that it "attempts to measure the expected value of litigating the action rather than settling it at the current time." *In re Cendant*, 264 F.3d at 238. Normally, proving damages involves many of the same risks as proving liability "because the former is contingent upon the latter." *Erie*

*County Retirees Ass'n*, 192 F.Supp.2d at 375.

 In this case, the risks to the Class of establishing damages are more significant than the risks of establishing liability. In order to prevail on their § 10(b) claim, Plaintiffs would have to establish, *inter alia*, that they sustained actual damages as a result of the Defendants' alleged misrepresentations or omissions. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 173 (3d Cir.2001). Even as to the majority of class members who sold their stock *after* Rent–Way's corrective disclosures and the precipitous drop in the stock's market price, proving damages would be a complex endeavor. As Class Counsel points out, mere market loss does not equate with damages under the federal securities laws; rather, the Class would be entitled to recover only for the amount of stock price inflation that it could prove resulted from the Defendants' alleged misstatements and omissions. The length of the Class Period—nearly two years—complicates this proof. Where, as here, an alleged fraud is perpetrated over a "prolonged" period, "this factor 'introduces other market variables which may affect the amount the market reacted to disclosures at different times during the class period.'" *In re Rent–Way Secur. Litig.*, 218 F.R.D. 101, 119 (W.D.Pa.2003) (citing *Blackie v. Barrack*, 524 F.2d 891, 909 n. 25 (9th Cir.1975)). Here, Plaintiffs have alleged a multiplicity of false and misleading statements by the Defendants during the Class Period, each of which arguably affected the level of artificial inflation in the price of Rent–Way's stock. *See id.*

As to those members who bought their shares of Rent–Way stock during the Class Period and sold *prior to* Rent–Way's disclosure of its accounting improprieties, proving injury in fact is similarly "compli-

cated by the reality that the degree of price inflation on any given day during the class period may well differ from the degree of inflation on a different day during the same period." *In re Rent–Way Secur. Litig.*, 218 F.R.D. at 119.

In sum, proof of the Class's damages is a complex matter for which expert testimony would almost certainly be required.[3] Moreover, there would likely be substantial disagreement at trial relative to the actual value of Rent–Way's stock at each point in time that it was purchased during the Class Period. A jury would therefore be faced with competing expert opinions representing very different damage estimates, thus adding further uncertainty as to how much money—if any—the Class might recover at trial. *See In re Warner Communications Securities Litig.*, 618 F.Supp. 735, 744–45 (S.D.N.Y.1985) ("It is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions."), *aff'd*, 798 F.2d 35 (2d Cir.1986).

Another element of risk stems from the provisions of the PSLRA, which allows for joint and several liability among defendants *only* if the trier of fact specifically finds that the defendant "knowingly committed a violation of the securities law." 15 U.S.C. § 78u–4(f)(2)(A). In the absence of a "knowing violation," a particular defendant can be held responsible only for his own proportionate share of liability. Thus, even assuming the Class could prove its case, there is a risk that those Defendants with "deeper pockets" may be held accountable only for a small percentage of the Plaintiffs' harm.

Finally, as we discuss in more detail elsewhere, Rent–Way was facing an imminent threat of bankruptcy throughout the course of these proceedings and there were potential disputes as to its insurance coverage. Accordingly, even if the Class were to obtain a favorable judgment against the Company, there was serious risk that such a judgment would not be collectible. All of these considerations weigh strongly in favor of approving the proposed Settlement.

### 6. *The Risks of Maintaining the Class Action Through Trial*

The sixth *Girsh* factor requires us to consider the risks that the Class would face of maintaining a class action through trial. Our Court of Appeals has recognized that this exercise is somewhat "perfunctory," since the district court always retains the discretion to decertify or modify a class that becomes unmanageable. *See In re Prudential Ins.*, 148 F.3d at 321; *In re Safety Components*, 166 F.Supp.2d at 91.

■ Nevertheless, we note that the issue of class certification was vociferously contested by PwC, a non-settling Defendant. Among other things, PwC argued that issues concerning the elements of reliance and actual damages would require individualized proof not suitable to resolution through the class action mechanism. Although the Court granted Cramer Rosenthal's motion for class certification, we specifically noted that a motion for decertification could be entertained at a later time if a more developed record so warranted.

Consequently, as in any class action, there remains some risk of decertification

---

**3.** In fact, Lead Counsel represented during class certification proceedings that the Class intended to establish its damages through the use of expert witnesses who could provide aggregate figures based on trading data relevant to the Class Period.

in the event the Propose Settlement is not approved. While this may not be a particularly weighty factor, on balance it somewhat favors approval of the proposed Settlement.

### 7. *The Ability of the Defendants to Withstand a Greater Judgment*

██ Pursuant to the seventh *Girsh* factor, we consider "whether the [D]efendants could withstand a judgment for an amount significantly greater than the Settlement." *In re Cendant,* 264 F.3d at 240. Notably, there has been a serious and persistent risk throughout this litigation of Rent–Way commencing bankruptcy proceedings. The unchallenged Declaration of Solomon B. Cera states in relevant part that:

> [b]ecause of the accounting irregularities that emerged beginning in October 2000, Rent–Way defaulted on its bank credit agreements and was operating under forbearance agreements with its lenders which could have been terminated during the pendency of this litigation. The Company also faced downgrades from Standard and Poor's on its corporate credit and bank loans. As a result, Rent–Way was saddled with an extremely high effective interest rate (15%) on its huge outstanding debt, which during the Class Period was in excess of $260 million. The opinion on its financial statements for fiscal year 2000 contained a "going concern" qualification, reflecting the very real possibility of bankruptcy. Even the sale of 295 stores for $101.5 million in cash announced on December 18, 2002 did not answer the continuing need to refinance. Absent resolution of the Class claim, Rent–Way could not refinance its debt at lower interest rates, which was necessary for the company to avoid bankruptcy. Further, absent a refinancing, the creditor banks would be entitled as of June 30, 2003 to receive warrants equivalent to 15% of Rent–Way's then outstanding shares if the Company's leverage ... was greater than 2.25, which it was at relevant times. The warrant price was $0.01 per share. An equally serious concern was that Rent–Way's credit facility was to mature on December 31, 2003, and the company desperately needed this source of funds to continue operating. Thus, at all times, the Class was faced with the very real possibility of being subordinated unsecured creditors in a Rent–Way bankruptcy.

(Cera Decl. at ¶ 7.) Had class members assumed the status of subordinated unsecured creditors in bankruptcy proceedings, they likely would have received nothing, given the higher priority that would have been afforded the secured claims of Rent–Way's lending institutions.

It is also pertinent to consider Rent–Way's potential insurance coverage for claims made against the Company's officers and directors. While the Company's policy had a $15 million limit of liability, a considerable amount of those proceeds were spent in defense of this litigation, leaving $12 million in potentially available proceeds by the time the proposed Settlement was reached. Presumably, those assets would have continued to be depleted as the litigation dragged on, thus further limiting the potential for a meaningful class recovery. In addition, because of the nature of the Class's claims (*i.e.,* securities violations involving alleged intentional fraud) the insurer had a potentially viable argument for excluding coverage. Alternatively, since the policy application included financial statements which were later restated, the carrier had a potential argument for rescission of the policy on the grounds that misrepresentations had been made in securing the insurance in the first instance. Ultimately, Class Counsel

negotiated to obtain $11 million of the $12 million potentially available under the policy.

Under these circumstances, even if the Class were to proceed to trial successfully against Rent–Way, it is highly doubtful that the Class would be able to secure a better recovery than that provided by the proposed Settlement. This factor therefore strongly favors approval of the proposed Settlement.

8. *The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and the Risks of Litigation*

 · Finally, we consider "whether the [proposed Settlement] is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *In re Prudential Ins. Co.,* 148 F.3d at 322. We have recognized that "[t]he touchstone of this examination is the 'economic valuation of the proposed Settlement.' " *Erie County Retirees Ass'n,* 192 F.Supp.2d at 376 (quoting *In re Safety Components,* 166 F.Supp.2d at 92). Generally, courts must take "the present value of the damages plaintiff would likely recover if successful, appropriately discounted for the risk of not prevailing, [to] be compared with the amount of the proposed Settlement." *Id.* (quoting *In re Safety Components,* 166 F.Supp.2d at 92). Discounting to present value is not required, however, "when the reasonableness of the settlement can be fairly judged." *Erie County Retirees Ass'n,* 192 F.Supp.2d at 376.

 In this case we have little difficulty concluding that the proposed Settlement is reasonable considering the best possible scenario for the Class and the risks of further litigation. While Lead Counsel have not specified what they believe to be the best case scenario in terms of the Class's potential damage recovery, counsel posits that a best-case recovery could generally be in the tens or even hundreds of millions of dollars. Nevertheless, in practical terms, the likelihood that the Class would ever collect on such a judgment is slim indeed. As we have discussed already, resolution of the Class's claims was a prerequisite to Rent–Way's ability to refinance its outstanding bank debt which, at times, exceeded $300 million. Had this proposed Settlement not been reached, bankruptcy was a very real threat for Rent–Way, if not an inevitability. Even if Rent–Way were able to stave off · bankruptcy short of trial, a verdict would most likely have rendered the Company insolvent. In addition, Rent–Way's available insurance proceeds would have been further depleted by continued litigation, and there was a real possibility that coverage as to a Class judgment might be denied altogether. With regard to the individual Defendants, there is no basis for us to conclude that they could have meaningfully funded a judgment in the tens or hundreds of millions.

Of course, this discussion assumes the Class would prevail at trial, which in itself is an uncertain proposition. Aside from the collectability of the judgment, there were other concerns associated with continued litigation. There were potential disputes as to issues of scienter, loss causation, damages and proportionate liability, all of which could have defeated a favorable verdict for the Class. Rent–Way was likely to assert that any wrongdoing was attributable solely to rogue employees acting outside the scope of their employment. A trial would probably have involved an expensive "battle of the experts" as to complex liability and damage issues. Factoring in the unpredictable nature of jury trials, a favorable class judgment was by no means guaranteed.

As is true in any case, the proposed Settlement "represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution." *Erie County Retirees Ass'n*, 192 F.Supp.2d at 377 (quoting *In re Safety Components*, 166 F.Supp.2d at 92). However, in light of all the circumstances, the $25 million Settlement is a very substantial recovery and an eminently fair resolution. This is especially true in this case because, short of settlement, it is highly probable that the Class would attain little or no *recoverable* damages.

### 9. *Summary*

■ As the foregoing discussion demonstrates, consideration of the relevant factors under *Girsh* favors our approval of the proposed Settlement. This litigation has been and will likely continue to be complex, expensive, and of significant duration if it proceeds to trial. This significant investment of time and money can be avoided, and the Class can obtain an immediate and substantial benefit, if the proposed Settlement is approved. The response of the Class to the proposed Settlement has been overwhelmingly favorable, save one objection which we find meritless. Class Counsel have performed significant work prosecuting this action and investigating the Class's claims. Their knowledge of the case is impressive and we are confident that they undertook these negotiations with a strong appreciation for the relative merits of their factual and legal contentions. There were considerable risks associated with further litigation, particularly in terms of establishing and recovering damages; consequently, these factors favor resolution short of trial. The virtual certainty that the Settling Defendants could not withstand a greater judgment strongly counsels in favor of approving the stipulated settlement. Finally, the proposed Settlement is well within the range of reasonableness when considering realistically the best possible recovery that the Class could obtain through further litigation and the risks attendant thereto. All of these factors tend to support the Class's request for approval of the proposed Settlement.

We also note that, at all times, settlement negotiations took place at arms length between highly experience and competent counsel. Their assessment of the settlement as fair and reasonable is entitled to considerable weight. *See In re Cendant Corp. Securities Litig.*, 109 F.Supp.2d 235, 255 (D.N.J.2000) ("Significant weight should be attributed 'to the belief of experienced counsel that settlement is in the best interest of the class.'") (quoting *Lake v. First Nationwide Bank*, 900 F.Supp. 726, 732 (E.D.Pa.1995)), *aff'd*, 264 F.3d 201 (3d Cir.2001), *cert. denied sub nom. Mark v. California Public Employees' Retirement Sys.*, 535 U.S. 929, 122 S.Ct. 1300, 152 L.Ed.2d 212 (2002). *See also Daniel B. v. O'Bannon*, 633 F.Supp. 919, 926 (E.D.Pa.1986).

Finally, we find no merit in the complaints lodged by the sole objector, Harry S. Keller, Jr. Essentially, Mr. Keller contends that the proposed Settlement should not be approved because it represents an inadequate recovery for the Class and because the notice to class members was deficient. These objections are not well-taken.

As the first point, Mr. Keller maintains that "the settlement is inadequate to class members since the proposed settlement is not commensurate with the value of underlying claim [sic]." (Harry J. Keller Jr.'s Notice of Objection [Doc. No. 140] at pp. 2–3.) Mr. Keller contends that Class Counsel have not set forth specific reasons for accepting an offer that, in his view, is

substantially below the value of the Class's claims. (*Id.* at p. 3.)

We disagree. Subsequent to the filing of Mr. Keller's objection, Lead Plaintiff and their attorneys filed substantial documentation in support of this proposed Settlement which collectively demonstrates its adequacy and fairness to the Class as a whole. In addition to their informative brief, Class Counsel supplied a thirty-four page affidavit from Mr. Cera, together with exhibits, in support of the Settlement. Class Counsels' papers discuss in detail their analysis of the relevant considerations under *Girsh.* Among other things, Class Counsel frankly acknowledge that a trial could theoretically result in a verdict against the Settling Defendants in the range of tens—or even hundreds—of millions of dollars in the event a jury accepted the Class's theory as to both liability and damages. Nevertheless, Class Counsel are convinced that the proverbial "bird in the hand" presented by the proposed Settlement is better than the "two in the bush" that might be awarded at trial.[4] Class Counsels' papers carefully outline the reasons for their conclusion. Of particular significance is the tremendous risk that any future award of damages will not be *collectible,* even if a favorable judgment were obtained. Thus, notwithstanding Mr. Keller's assertion to the contrary, we find that Lead Plaintiff has met its burden of demonstrating that the proposed Settlement is fair, adequate, and reasonable.

Mr. Keller also complains that the class notice "fail[s] to provide enough substantive information to the class so that a reasonable person could fully access [sic] the possibility of successful litigation and the cost of prosecuting this claim." (Keller Objection at p. 3.) More specifically, he claims that the Notice does not specifically set forth the amount of damages which the Class could claim under the best-case scenario or specify the obstacles to a successful class recovery. According to Mr. Keller, "it is utterly impossible for any member of the class to intelligently determine the fairness of the proposed settlement given the information provided in court documents and the Notice to the Class" (Keller Objection at p. 6), thus resulting in a denial of due process to the Class.

This argument also lacks merit. "In order to satisfy due process, notice to class members must be 'reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *In re Cendant Corp. Secur. Litig.,* 109 F.Supp.2d at 254 (quoting *In re Ikon Office Solutions, Inc. Securities Litig.,* 194 F.R.D. 166, 174

---

4. Assuming, e.g., that the Class could theoretically establish damages in the amount of $500 million at trial, the $25 million proposed Settlement represents a recovery of five percent (5%) of the maximum damages award. Assuming that the Class could demonstrate damages in the amount of $100 million, the proposed Settlement represents twenty-five percent (25%) of the Class's maximum damages. Other federal courts have sustained settlements that represent a comparable percentage recovery. *See, e.g., In re Prudential Secur., Inc.,* MDL No. 1005, 1995 WL 798907 (S.D.N.Y. Nov.20, 1995) (approving settlement of between 1.6% and 5% of claimed damages), *In re Crazy Eddie Secur. Litig.,* 824 F.Supp. 320 (E.D.N.Y.1993) (settlement of between 6% and 10% of damages), *In re Michael Milken & Assoc. Secur. Litig.,* 150 F.R.D. 57 (S.D.N.Y.1993) (recovery of 7.5%). *See also* Denise Martin et al., National Econ. Research Ass'n, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions,* 10–11 (NERA 1996) (study of 377 securities class action settlements between January 1991 and June 1996 demonstrating that "the average settlement comprises between 9% and 14% of the plaintiffs' claimed damages") (cited in *In re Cendant Corp. Securities Litig.,* 109 F.Supp.2d at 245).

(E.D.Pa.2000)). This standard is met if the notice informs class members concerning: (i) the nature of the litigation; (ii) the general terms of the settlement; (iii) where complete information can be located; and (iv) the time and place of the fairness hearing and that objectors may be heard. *Id.* (citing *In re Prudential Ins. Co. of Am. Sales Prac. Litig.*, 962 F.Supp. 450, 527 (D.N.J.1997), *aff'd*, 148 F.3d 283, 311 (1998), *cert. denied*, 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999)).

The Private Securities Litigation Reform Act imposes additional requirements relative to the notice of settlement. Specifically, the notice must include the following information:

(A) the amount of the settlement proposed to be distributed to the parties as determined in the aggregate and on an average per-share basis;

(B) if the parties do not agree on the average amount of damages per share that would be recoverable in the event plaintiffs prevailed, as is the case here, a statement from each settling party concerning the issue(s) on which the parties disagree;

(C) a statement indicating which parties or counsel intend to make an application for an award of attorneys' fees and costs, the amount that will be sought, and a brief explanation in support of the request;

(D) the name, telephone number, and address of one or more representatives of counsel for the Class who will be reasonably available to answer questions concerning any matter contained in the notice;

(E) a brief statement explaining why the parties are proposing the settlement; and

(F) such other information as may be required by the Court.

*See* 15 U.S.C.A. § 78u–4(a)(7)(A)–(F) (West 1997).

■ We find that the notice sent to class members complied with these requirements. To the extent Mr. Keller objects that more information should have been provided, he demands a level of specificity not required by Rule 23(e), federal due process standards, or the PSLRA. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 177 F.R.D. 216, 231 (D.N.J.1997) (Rule 23(e) notice is designed to be only "a summary of the litigation and the settlement [and] it is crucial to apprise the class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation.... The notice need not be unduly specific ....") (internal and end citations omitted). The notice here advised class members of the time and date of the hearing, apprised them of their opportunity to be heard at that time, informed them generally about the litigation and the proposed Settlement, and invited them to contact Mr. Cera with any questions they might have concerning the proposed Settlement.

Moreover, the court record provided other important information available to class members. In particular, the Declaration of William McDonnell filed in April 2003 discusses the imminent threat of insolvency that Rent–Way faced in the event the litigation was not resolved. (*See* Doc. No. 120.) The parties' extensive class certification papers shed additional light on the complex liability and damage issues presented by this case. To the extent these sources were insufficient, class members were invited to contact Mr. Cera (and many apparently did) for more detailed information about the case and the proposed Settlement. Accordingly, we find no

merit to Mr. Keller's complaint that "it is utterly impossible for any member of the class to intelligently determine the fairness of the proposed settlement given the information provided in court documents and the Notice to the Class." (Keller Objection at p. 6.)

For all of the foregoing reasons, we conclude that the proposed Settlement between the Class and the Settling Defendants is fair, adequate, and reasonable and will serve the bests interests of justice. The Court therefore approves the proposed Settlement.

## B. The Proposed Plan of Allocation

 The details of Lead Plaintiff's proposed Allocation Plan is set forth in the class notice. Essentially, it provides for a greater proportionate share of the settlement monies to those members who held Rent–Way stock through the end of the Class Period and/or sold their shares at a loss after the end of the Period as compared to those who bought and sold during the Class Period. With regard to the latter group, their "allowed loss" for purposes of calculating distribution amounts will be reduced by 50%. According to Lead Plaintiff, no class member has objected to the Allocation Plan. Class Counsel further avers, based on expert analysis, that the vast amount of damaged shares were ones held to the end of the Class Period. Courts in this district "generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable." *In re Corel Corp., Inc.*, 293 F.Supp.2d 484, 493 (E.D.Pa.2003) (quoting *Aetna Inc. Sec. Litig.*, Civ. A. MDL 1219, 2001 WL 20928 at *12, (E.D.Pa.Jan.4, 2001)). The Court finds that the proposed plan for allocation of the settlement proceeds is fair, adequate and reasonable. It will therefore be approved.

## C. The Application for Approval of Class Counsel's Fees and Expenses

Also pending before the Court is an application by Class Counsel for 25% of the settlement consideration (or $6.25 million)—including interest through the date of payment to counsel—and reimbursement of $283,907.84 in expenses, plus interest. There is one objection to the requested fee raised by Frank E. Waters. Mr. Waters contends that an award of 25% is excessive and represents a windfall to Class Counsel. He requests that counsel fees be limited to no more than 20% of the settlement fund, or $5 million.

The two primary means of calculating attorneys' fees are the "percentage-of-recovery" method and the "lodestar" method. "The percentage-of-recovery method is generally favored in cases involving a common fund, [ ] and is designed to allow courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.' " *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 732 (3d Cir.2001) (quoting *In re Prudential*, 148 F.3d at 333) (internal footnote omitted), *cert. denied sub nom. Kirby McInerney & Squire, LLP v. Joanne A. Aboff Family Trust*, 534 U.S. 889, 122 S.Ct. 202, 151 L.Ed.2d 143 (2001). The "lodestar" method, on the other hand, is typically applied in statutory fee-shifting cases, and "is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation." *Id.* We conclude that the "percentage-of-recovery" method is the appropriate vehicle in this case for compensating the efforts of Lead Counsel. *See id.* at 734; *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n. 1 (3d Cir.2000); *Brytus v. Spang & Co.*, 203

F.3d 238, 243 (3d Cir.2000); *In re Prudential*, 148 F.3d at 333–34; *In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 821 (3d Cir.1995).

 Next, we assess the appropriateness of Lead Counsels' requested fee award by considering numerous factors, *to wit:* (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) awards made in similar cases. *Gunter*, 223 F.3d at 195 n. 1 (citing *In re Prudential*, 148 F.3d at 336–40; *In re GM Pick–Up Truck*, 55 F.3d at 819–22; MOORE'S FEDERAL PRACTICE, MANUAL FOR COMPLEX LITIGATION (THIRD) § 24.121, AT 207 (1997)). These factors need not be applied in any formulaic way. Since each case is unique, certain factors may outweigh others. *Id.* In this case, however, the factors both individually and collectively weigh in favor of an approval of Class Counsels' fee application.

Initially, we consider the size of the settlement fund and the number of persons that will benefit from the settlement. In most instances, the procedure for arriving at a fee award in common fund cases "will involve a sliding scale dependent upon the ultimate recovery, the expectation being that, absent unusual circumstances, the percentage will decrease as the size of the fund increases." *Court Awarded Attorney Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 237, 256 (1985) (quoted in *In re Cendant Corp. PRIDES Litig.*, 243 F.3d at 736). "The basis for this inverse relationship is the belief that '[i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.'" *In re Prudential*, 148 F.3d at 339 (quoting *In re First Fidelity Bancorporation Secur. Litig.*, 750 F.Supp. 160, 164 n. 1 (D.N.J. 1990)). Accordingly, the Third Circuit has advised that "district courts setting attorneys' fees in cases involving large settlements must avoid basing their awards on percentages derived from cases where the settlement amounts were much smaller." *In re Cendant Corp. PRIDES Litig.*, 243 F.3d at 736.

In this case, the $25 million settlement fund—while not a "mega fund"[5]—is nevertheless a considerable recovery for the Class, especially in light of Rent–Way's potential insolvency and the danger that its insurance coverage might be legitimately disputed. A large portion of the recovery, *to wit,* $21 million, is comprised of a cash payment that has already been deposited into an interest-bearing escrow account. The remaining $4 million is subject to payment pursuant to a two-year, 6% promissory note issued by Rent–Way, with payments to be made in four semi-annual

---

**5.** Courts and legal commentators seem to define "mega funds" as those consisting of at least $50 to $100 million. *See, e.g., In re Rite Aid Corp. Secur. Litig.*, 269 F.Supp.2d 603, 610 (E.D.Pa.2003) (citing compilation of various class action settlements prepared by Professor John C. Coffee, Jr., Columbia University Law School, in which a "mega fund" is defined as one exceeding $50 million); *In re* *Orthopedic Bone Screw Prod. Liab. Litig.*, 2000 WL 1622741 at *7 (E.D.Pa. Oct.23, 2000) ("Courts have generally decreased the percentage awarded as the amount recovered increases, and $100 million seems to be the informal marker of a 'very large' settlement.") (cited in *In re Cendant PRIDES Litig.*, 243 F.3d at 737 n. 19).

payments over the two-year period. Thus, as Lead Counsel points out, the lion's share of the settlement, being a cash payment, is not subject to doubt in terms of its value to the Class.[6] Further, the number of class members potentially benefitted by the Settlement is great. We have previously observed that, by Lead Counsel's estimate, putative class members number at least in the hundreds of thousands. *See In re Rent–Way Secur. Litig.*, 218 F.R.D. at 112 (finding the putative class sufficiently numerous and geographically dispersed such that the "numerosity" requirement under Rule 23 is satisfied for class certification purposes). Thus, the size of the fund and number of persons benefitted are factors that support Lead Counsel's requested fee award.

A fee award of 25% is also commensurate with the range commonly approved in cases involving comparable settlement funds. *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D.Del. 2002) (in class action involving $44.5 million settlement fund, attorneys' fees amounting to 22.5% of the fund were reasonable); *In re Rite Aid Corp. Secur. Litig.*, 146 F.Supp.2d 706, 735 (E.D.Pa.2001) (citing affidavit of Professor John C. Coffee, Jr. of Columbia University Law School, in which 289 class action settlements are compiled ranging from under $1 million to $50 million; average attorney's fees percentage is 31.71% and median is one-third); *In re NASDAQ Market–Makers Antitrust Litig.*, 187 F.R.D. 465, 486 (S.D.N.Y.1998) (finding that awards in class action settlements up to $50 million typically range from 20–30% with a benchmark of 25%) (citing cases); *In re Medical X–Ray Film Antitrust Litig.*, No. 93–5904, 1998 WL 661515 (E.D.N.Y. Aug.7, 1998)

(awarding fees that comprised 33.33% of the $39.36 million settlement); *Lazy Oil, Co. v. Witco Corp.*, 95 F.Supp.2d 290, 342–43 (W.D.Pa.1997) (McLaughlin, J.) (noting a range of 20–27% fee awards in cases that settled for $20–30 million, and awarding attorneys' fees in the amount of 28% of the $18.9 million settlement fund). We also note, incidentally, that he percentage of recovery sought here is well within the range of contingent fees—i.e., 33–1/3% to 40%—that are commonly negotiated in these kinds of cases. (*See* Cera Decl. at ¶ 82.)

█ We are cognizant, however, that the "varying ranges of attorneys' fees confirm that a district court may not rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case." *In re Cendant PRIDES*, 243 F.3d at 736. Accordingly, we consider the other factors outlined in *Gunter*.

For example, we view the reaction of the Class as a factor also supporting approval of Lead Counsels' fee petition. *See Gunter*, 223 F.3d at 199 ("a client's views regarding her attorneys' performance and their request for fees should be considered when determining a fee award."). In this case, the notice of the proposed Settlement was mailed to more than 8,600 class members and included language advising the members that Class Counsel would seek an award of *up to* 30% of the Settlement fund, plus expenses. Consistent with the Notice, Lead counsel have requested a fee award of 25% of the Settlement Fund, along with reimbursement of their expenses. The Notice further advised that class members could object to the fee application. In response to the class notice, just one member—Frank Waters—objects

---

**6.** Lead Counsel represents that they will collect their fees only from the proceeds from the promissory note as they become due and are

paid. (*See* Lead Pl.'s Counsels' Appl. for Attorneys' Fees and Reimbursement of Expenses [Doc. No. 144] at p. 17 n. 9.)

to the requested fee award and, as discussed earlier, only one other member (Harry J. Keller, Jr.) objects to the Settlement.[7] Notably, no institutional investors have objected either to the Settlement or to Lead Counsels' fee request. Moreover, as explained *infra*, we find Mr. Waters's objections to be meritless. Thus, the absence of substantial objections by other class members to the fee application supports the reasonableness of Lead Counsels' request.

The fee request is further supported by the level of skill and efficiency displayed by attorneys representing the Class. In appointing GBC & S Lead Counsel, the Court previously indicated its satisfaction that the firm would be an "effective lead counsel in this action." *See EZRA Charitable Trust*, 136 F.Supp.2d at 445–46. We noted that:

> [t]he firm's primary practice area is complex business litigation, including securities litigation, antitrust and trade regulation, consumer class actions, employment discrimination, bankruptcy litigation, and corporate litigation.... Mr. Cera, who has thus far appeared on behalf of GBC & S, has previously been involved in several complex class actions, and has received praise from the Chief Judge of the United States District Court for the Northern District of California in connection with his representation of a class of approximately 3,000 investors in that court.... GBC & S has been involved in the prosecution of securities class actions for over twenty years.... For these reasons, we find that GBC & S possesses the requisite experience and expertise to serve as lead counsel in this action, and [we]

therefore approve Cramer's selection of lead counsel.

*Id.* at 446. Having thus initially expressed our confidence in Lead Counsels' abilities, the Court has not since been disappointed. On the contrary, Class Counsel in this case have shown themselves to be attorneys of the highest caliber, at all times prosecuting this action with a high degree of skill and professionalism. We agree with counsel that their efforts in bringing a significant portion of this complex matter to a successful and efficient conclusion are the best indicator of counsels' experience and ability. *See Cullen v. Whitman Medical Corp.*, 197 F.R.D. 136, 149 (E.D.Pa.2000) ("The single clearest factor reflecting the quality of class counsels' services to the class are the results obtained."). This is all the more true given the high quality of the Settling Defendants' legal representation. *See Lazy Oil*, 95 F.Supp.2d at 322 (observing that, in light of the quality of legal representation provided by counsel for the settling defendants, class counsel "faced a formidable task in prosecuting" the action). Our circuit court of appeals has previously advised that "the stated goal in percentage fee-award cases" is "ensuring that competent counsel continue to be willing to undertake risky, complex and novel litigation.'" *Gunter*, 223 F.3d at 198 (quoting *Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 338–39, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980)). Here, the skill and efficiency of Lead Counsel are factors weighing strongly in favor of an approval of counsels' fee application.

Another factor for consideration is the complexity and duration of the litigation. We have previously addressed at length the complexity of this litigation, which involves intricate issues of accounting and

---

**7.** Mr. Keller has no objection to a fee request of 18–25% of the Settlement but would object to an award of more than 25 percent.

**516**

economics and a trail of alleged improprieties spanning more than two years. The complexities are illustrated well by the fact that Rent–Way itself expended approximately $9,000,000 over the course of ten months in conducting its own internal investigation into the Company's accounting problems. The three-year duration of this litigation—while having not yet proceeded to formal merits discovery—has required significant efforts on the part of Lead Counsel. Among other things, Class Counsel have conducted a lengthy investigation into the facts of this case which has involved reviewing hundreds of thousands of documents, interviewing numerous fact witnesses and consulting with experts in the fields of accounting, investment banking, and economics. Counsel have undertaken significant briefing relative to: (i) our selection of Cramer Rosenthal as lead plaintiff;[8] (ii) Defendants' motions to dismiss the consolidated class action complaint, and (iii) Cramer Rosenthal's motion for class certification. Significant informal discovery has occurred through the parties' Rule 26 initial disclosures and Lead Counsels' efforts to obtain relevant documentation from third parties. Additional discovery, including two lengthy depositions, occurred in the context of the motion for class certification. Finally, in settling this aspect of the litigation, counsel engaged in intense and protracted settlement negotiations over the course of nearly a year. Thus, counsels' efforts to date in view of the complexity and duration of this litigation further support counsels' requested fee award.

We also consider is the risk that counsel takes in prosecuting a client's case. *See Gunter*, 223 F.3d at 199. Here, Lead Counsel faced a significant risk that they would never be reimbursed for their efforts given Rent–Way's precarious financial position, the possibility that coverage might be contested by Rent–Way's insurer, and the significant proof issues (as to both liability and damages) that counsel had to tackle. Aside from investing their time, counsel had to front copious sums of money (over $200,000) in order to prosecute this litigation in a responsible fashion. Moreover, although several former Rent–Way officials have entered guilty pleas in criminal actions stemming from the underlying accounting scandal, it is notable that Lead Counsel was not the beneficiary of any governmental investigation. In fact, BGC & S was not privy to any information pertaining to these federal criminal investigations—or the SEC's civil enforcement action—until well after this Settlement was reached. Thus, the risks that counsel incurred in prosecuting this case were substantial and further support the requested fee award.

In addition, Lead Counsel has devoted significant time to this matter, as documented in Mr. Cera's declaration. GBCS and local counsel have collectively expended over 7,958 hours on this case. By any measurement, this represents a significant investment of time, personnel and resources that have been diverted from other legal matters. For all of these reasons, we conclude that consideration of the traditional *Gunter* factors supports Lead Counsels' fee request.

■■■■■■ This, however, is not the end of our inquiry. Our circuit court also recommends, in mainstream cases, that district courts cross-check the percentage award against the applicable "lodestar"

---

**8.** We note that this process involved consideration of a unique legal issue—namely, whether Cramer Rosenthal, as an investment adviser, had standing to pursue the claims of its clients and thus obtain status as sole Lead Plaintiff in this case. *See EZRA Charitable Trust,* 136 F.Supp.2d at 439–44.

award, which is measured by multiplying the number of hours he or she reasonably worked on a client's case by a reasonable hourly billing rate of such services given the geographical area, the nature of the services provided, and the experience of the lawyer. *Gunter,* 223 F.3d at 195 (citing *In re Prudential,* 148 F.3d at 331 n. 102, 333; *Court Awarded Attorney Fees, Report of the Third Circuit Task Force,* 108 F.R.D. 237, 243 (1985)). The hourly rate to be applied is that which is normally charged in the community where the attorney practices. *See In re Fine Paper Antitrust Litig.,* 751 F.2d 562, 590–91 (3d Cir. 1984); *U.S. ex rel.John Doe I v. Pennsylvania Blue Shield,* 54 F.Supp.2d 410, 414 (M.D.Pa.1999); *In re Centocor, Inc. Secur. Litig.,* No. 92–cv–1071, 1993 WL 189937 at *5 (E.D.Pa. June 2, 1993).

In this case, GBCS and local counsel collectively expended 7,958.35 hours on this litigation through July 31, 2003.[9] Counsel have appended to Mr. Cera's declaration detailed summaries indicating the amount of time, broken down by category, that various attorneys and professional staff have invested in this case, along with each individual's hourly billing rate. Having reviewed this information, the Court is satisfied that the amount of time that Lead Counsel have spent working on the case is reasonable in light of the nature of the allegations and the tasks required to be performed. We are equally satisfied that the firms' resources have been efficiently allocated to the documented tasks. In addition, we are satisfied that the documented billing rates are both consistent with regional market standards and commensurate with the talent displayed by GBCS and local counsel.[10] Based on these fig-

ures, the cumulative lodestar for the services performed by the two law firms is $2,644,315.95. Thus, Lead Counsels' fee request represents a multiple of 2.36 times the lodestar amount. A multiplier of 2.36 is well within the range typically approved by federal courts in this circuit. *See, e.g., In re Cendant Corp. PRIDES,* 243 F.3d at 742 ("strongly suggesting" that a lodestar multiple of 3 would be the appropriate ceiling for a fee award in the instant case, which was neither legally nor factually complex, did not require significant motion practice or discovery, and was only four months in duration from the filing of the amended complaint to submission of the proposed settlement); *In re Prudential,* 148 F.3d at 341 (noting that multiples ranging from one to four are "frequently awarded in common fund cases when the lodestar method is applied") (quoting 3 Herbert Newberg & Alba conte, Newberg on Class Actions, § 1403.at 14–5 (3d ed.1992)); *In re Rite Aid Corp. Secur. Litig.,* 269 F.Supp.2d 603, 611 (E.D.Pa. 2003); (fee award amounting to 4.07 multiplier approved); *In re ATI Tech., Inc. Sec. Litig.,* 2003 WL 1962400 at *3 (Apr. 28, 2003) (approving multiplier of 2.35); *In re Aetna, Inc. Sec. Litig.,* 2001 WL 20928 at *15 (awarding 3.6 multiplier); *In re Ikon Office Solutions, Inc. Secur. Litig.,* 194 F.R.D. 166, 195 n. 32 (E.D.Pa.2000) (multiplier of 2.46 approved); *In re Computron Software, Inc.,* 6 F.Supp.2d 313, 323 (D.N.J.1998) (upholding fee award 2.5 times the lodestar); *Local 56 United Food and Commercial Workers Union v. Campbell Soup Co.,* 954 F.Supp. 1000, 1005 n. 7 (D.N.J.1997) (multiplier more than two times the lodestar); *J/H Real Estate Inc.*

---

9. This is exclusive of any time spent working on counsels' fee petition.

10. Counsels' fees were appropriately calculated based on current, rather than historic,

hourly rates. *See In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166, 195 (E.D.Pa. 2000) (citing cases).

*v. Abramson,* 951 F.Supp. 63, 65 (E.D.Pa. 1996) (fee award more than 2.5 times the lodestar).

Mr. Waters contends that Lead Counsels' fee should be capped at twenty percent (20%) because, in Mr. Waters's opinion, "counsel for the class members did not spend much time litigating this matter." (Frank E. Waters's Notice of Objection and Intention to be Heard at Settlement [Doc. No. 141] at unnumbered p. 4.) Mr. Waters posits that "most of counsel's the [sic] time was spent in matters not related to the merits of the case such as lead plaintiff contests and confirmatory discovery." (*Id.*)

We find this criticism to be without foundation. The record here adequately documents that the largest percentage of Lead Counsels' time (over 3,300 hours) was spent engaging in informal merits discovery, initial disclosures and post-filing investigation. Other substantial endeavors included factual and legal research (2,069.5 hours) and pleadings practice (1,680.25 hours). Lead Plaintiffs' pleadings practice included its efforts (almost entirely successful) defending the various Rule 12(b) motions filed by each Defendant and obtaining class certification of this action— matters undeniably of great importance to the Class. *See, e.g., In re Corel Corp. Inc.,* 293 F.Supp.2d at 484, 491–92 (E.D.Pa. 2003) (the value of a class action in terms of the range of recovery one can expect depends largely on the certification of the class and the ability to sustain that class through trial) (citing *In re GM Truck,* 55 F.3d at 817). Nor can we agree with Mr. Waters's suggestion that counsels' efforts relative to the selection of Cramer Rosenthal as lead plaintiff were inconsequential to the Class or less worthy of compensation. The PSLRA's requirement of a court-supervised process to select the leadership in a securities fraud action, *see* 15 U.S.C.A. § 78u–4(a)(3)(B)(iii), is fundamental to the statute's broad remedial purpose of "creat[ing] mechanisms to ensure the protection of class members' interests in securities litigation." *In re BankAmerica Corp. Secur. Litig.,* 350 F.3d 747 (8th Cir. 2003).

Mr. Waters opines that Lead Counsel could not have conducted any significant merits discovery because the PSLRA generally prohibits discovery during the pendency of a motion to dismiss, *see* 15 U.S.C. § 78u–4(b)(3)(B), and the time line for merits discovery following our resolution of those motions was "very short." (Waters's Notice of Objection [Doc. 141] at unnumbered p. 5.) Again, this contention is without merit. The record amply demonstrates that Lead Counsel conducted a very substantial investigation into the merits of the Class's claims, notwithstanding the absence of a formal case management schedule governing merits discovery. As set forth in Mr. Cera's declaration, counsel undertook an intensive factual investigation both prior to and after the filing of the Amended Complaint, which included interviewing many witnesses and reviewing hundreds of thousands of documents obtained from publicly available sources and also through the Defendants' Rule 26 initial disclosures and subpoena's served on relevant third parties. There is no basis for us to conclude, as does Mr. Waters, that the discovery undertaken by counsel was unrelated to the merits of this case or the settlement achieved herein.

Nor do we agree with Mr. Waters's contention that the litigation was "not complex" and presented only "limited risk" to Lead Counsel. (Waters's Notice of Objection at unnumbered p. 6.) While Mr. Waters posits that "counsel's [sic] ability to obtain such a quick settlement bespeaks the simplicity and low risk of this litigation" (*id.*), in the light of this record, we

find the settlement more indicative of a high degree of diligence, efficiency and skill on the part of Class Counsel which fully justifies the compensation Lead Counsel now seek. Mr. Waters's assertions notwithstanding, this litigation was neither "simple" nor "low risk." Despite Rent–Way's public acknowledgment that its net earnings had been grossly overstated during the Class Period, the Company's liability in this case (which would require a finding of scienter) was never a *fait accompli*, particularly in view of Rent–Way's likely defense that the malfeasors acted *ultra vires*. Collecting on a meaningful judgment was even more dubious for the factors previously discussed—most notably, Rent–Way's precarious financial position and the threat that its insurance coverage might be successfully contested. Further, while Rent–Way may have had a strong incentive to settle this litigation so as to refinance its debt, merely obtaining a settlement and obtaining a *responsible* settlement that would adequately compensates the Class and merit court approval are two different things. The fact that this settlement was achieved two and one-half years into the litigation and after nearly a year of aggressive negotiations among experienced counsel is testimony to Lead Counsels' hard work in obtaining a responsible and beneficial resolution of these claims.

In sum, we find no merit to Mr. Waters's objections relative to Lead Counsels' fee application. We further find that counsels' request for a fee award of 25% of the Settlement Fund is fair and reasonable based on all of the foregoing considerations.

 We next conclude that counsel should be reimbursed for their expendi-

tures in the gross amount of $283,907.84, with interest. "There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of . . . reasonable litigation expenses from that fund." *In re Corel Corp. Inc.*, 293 F.Supp.2d at 498 (quoting *Ikon*, 194 F.R.D. at 192). *See also In re SmithKline Beckman Corp. Sec. Litig.*, 751 F.Supp. 525, 531 (E.D.Pa.1990). Of the gross amount, $211,131.52 represents the unreimbursed expenses which Lead Counsel have incurred in prosecuting this matter.[11] These expenses include the costs associated expert consultation, document reproduction, legal research, transportation and the like.

In addition, the notice informed class members that Class Counsel would seek reimbursement of expenses in an amount not to exceed $300,000. The documentation appended to Mr. Cera's application shows that the expenses incurred by Lead Counsel in this matter were both reasonable and necessary to an effective prosecution of this litigation. Despite sufficient notice to the Class, there have been no objectors who oppose the requested reimbursement of expenses. Finding that these expenses were both reasonable and necessary to the furtherance of Plaintiffs' case, we will approve counsels' request for reimbursement.

### D. The Objectors' Applications for Attorneys' Fees

Lastly, the Court has before it fee applications submitted on behalf of counsel for the two objectors—Mr. Keller and Mr. Waters. Mr. Keller's counsel, Nicholas Fausto, Esq., seeks an award of $14,625.00 to compensate him for time spent in pre-

---

11. The remaining amounts comprise expenses incurred by counsel representing other class members.

paring his objections to both the settlement and an award of Class Counsel fees in excess of 25 percent of the Settlement Fund. Mr. Waters's counsel, Douglas A. Cole, Esq., seeks fees in the amount of $26,300.00 as compensation for his efforts in opposing a fee award in excess of 20 percent of the Settlement fund.

 Although an objector to a class action settlement is not generally entitled to an award of counsel fees, "objectors are entitled to compensation for attorneys' fees and expenses if the settlement was improved as a result of their efforts." *Spark v. MBNA Corp.*, 289 F.Supp.2d 510, 513 (D.Del.2003) (citing *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 273 F.Supp.2d 563 (D.N.J.2003)). If an objector is successful in challenging an award of attorneys' fees to lead class counsel, his or her objection has conferred a benefit upon the class. *Id.* (citing *In re Prudential*, 273 F.Supp.2d at 565). Absent a showing that the objector substantially enhanced the benefits to the class under the settlement, the objector is not entitled to a fee. *Id.* (citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir.2002) [, *cert. denied*, 537 U.S. 1018, 123 S.Ct. 536, 154 L.Ed.2d 425 (2002) ] ).

 Applying this standard, we will deny the fee petitions submitted by the objectors' counsel. These fee applications are premised on Mr. Fausto's and Mr. Cole's respective assertions that they were personally instrumental in persuading Lead Counsel to reduce their fee request from 30% of the Settlement Fund to 25% of the Fund. Mr. Fausto and Mr. Cole thus take credit for essentially obtaining another $1.25 million for the benefit of the Class. We find no basis in the record for this conclusion. Fundamentally, while it is true that Lead Counsel's notice of the proposed Settlement indicated their intention to seek fees in an amount *up to* 30% of the Settlement fund, we do not infer from this notice that—but for Mr. Keller's and Mr. Water's objections—Class Counsel would have necessarily sought, and received, that amount. In fact, Lead Counsel specifically deny that the objections played any role whatsoever in their ultimate fee request of 25 percent. (*See* Decl. of Bruce Bernard [Doc. No. 164]; Decl. of Steven O. Sidener [Doc. No. 165]; Decl. of Solomon B. Cera in Opp. to Objectors' Counsel's Fee Applications [Doc. No. 166].) On the contrary, Lead Counsel maintain that their 25% fee request was premised, quite independent of the Keller/Waters objections, on their conclusion that such an award was fully supported and appropriate under Third Circuit jurisprudence.[12] On the basis of the present record, the Court accepts Lead Counsels' representation. We also find that, irrespective of the objections, we likely would have arrived at the same fee award. Because we find no basis to conclude that the objectors substantially improved the Class's position in this Settlement, we will deny the fee applications submitted by Mr. Cole and Mr. Fausto.

12. In fact, Mr. Cera characterizes the efforts of objectors' counsel, particularly Mr. Cole, as nothing short of "an attempt at legalized extortion in the guise of an objection." (Lead Pl.'s Counsel's Appl. for Attorneys' Fees and Reimbursement of Expenses [Doc. No. 144] at p. 31.) Mr. Cole apparently contacted Mr. Cera shortly before the date which the Court had established as the deadline for filing objections to the notice of Settlement. Mr. Cera accuses Mr. Cole of attempting, during this phone call, to strike a separate, more favorable settlement for Mr. Cole's client in derogation of Mr. Cera's fiduciary responsibilities to the Class as a whole. Although the Court is disturbed by the circumstances giving rise to these accusations, we need not resolve this factual issue for present purposes. It is sufficient that we conclude Mr. Cole has failed to demonstrate a basis for obtaining his requested attorneys' fees.

## III. CONCLUSION

Based upon the foregoing reasons, the proposed Settlement and Plan of Allocation is approved. Lead Counsel's application for attorneys' fees and expenses will be granted. The applications submitted by Objectors Harry J. Keller, Jr. and Frank Waters will also be denied. An appropriate Order follows.

### ORDER

AND NOW, this _____ day of December 2003, for the reasons set forth in the accompanying Memorandum Opinion, IT IS HEREBY ORDERED that:

1. The Motion [Doc. No. 147] by Class Representative Cramer Rosenthal McGlynn, LLC for Final Approval of Settlement With Rent–Way Settling Defendants and for Approval of Plan of Allocation of Settlement Proceeds is GRANTED;

2. The Motion [Doc. No. 144] by counsel for the Class Representative for attorney's fees and reimbursement of expenses is GRANTED;

3. The Motion [Doc. No. 154] for attorney's fees filed by Nicholas M. Fausto, Esq. legal counsel for objector Harry J. Keller, Jr., is DENIED; and

4. The Motion [Doc. Nos. 157 and 162] for attorney's fees filed by Douglas A. Cole, Esq., legal counsel for objector Frank Waters, is DENIED.